**AMERICAN SYNTHETIC DYES, Inc., v. EDWARDS, Collector of Internal Revenue.**

(District Court, S. D. New York. May 2, 1923.)

Internal revenue ⊕⊃9—Wet picric acid, sold for military purposes, held an "explosive," within Munition Manufacturer's Tax Act.

Wet picric acid, in which 10 per cent. of water was left in the process of manufacture to insure safety in carriage, and which required drying out to render it effective as a high explosive, sold to foreign governments for military purposes during the war, *held* an "explosive," within the meaning of Internal Revenue Act Sept. 8, 1916, § 301(1),

⊕⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

being Comp. St. 6336¼b(1), and the manufacturer subject to munition manufacturer's tax thereunder.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Explosive.]

At Law. Action by the American Synthetic Dyes, Inc., against William H. Edwards, Collector of Internal Revenue. Verdict directed for defendant.

Roger B. Hull and John Hunter, both of New York City, for plaintiff.

Thomas J. Crawford, of New York City, and P. C. Alexander, of Washington, D. C., for defendant.

LEARNED HAND, District Judge. The action is in common form to recover from the collector the amount of a tax exacted by duress. The tax was levied upon the profits made by the plaintiff during the year 1916 from the manufacture and sale of wet picric acid. The acid so made was sold to the Imperial Russian Government and the republic of France for military purposes, and the question at issue is whether it was an "explosive" within the meaning of subdivision (1) (a) of section 301 of the revenue act of 1916 (Comp. St. § 6336¼b). If it was, the defendant wins; if not, the plaintiff.

The technical facts on which the case depends are simple. Picric acid, when dry, is an extremely high explosive, and was extensively used for bursting charges in the Great War, especially by the French. To be reliable and successful, it must, however, be dry; while, on the contrary it can be safely transported only when wet. Wet picric acid is that which contains 10 per cent. of water; dry, that in which the water has been reduced below 1 per cent. It is the practice by centrifuges to drive off the water used in manufacture down to the 10 per cent. required for safety, and it would be in theory possible to continue the process down to the amount permissible for military uses. However, this would involve much danger, as at the end there would be probability of explosion. For that reason, in drying, the wet picric acid is spread in pans and dried by hot air, a process which takes a number of hours to complete. Then the acid is immediately ready for use as an explosive.

Wet picric acid can be exploded, as the experiments of the United States Department of Agriculture have demonstrated. The explosibility of the wet acid may indeed be complete and violent, when proper detonators and a "boosting" charge are employed. However, it was never in practice so used in war, and perhaps in 1916 this explosibility was not known. It was purposely left wet only to insure safety of transportation.

Such being the facts, the question arises whether this substance is within the words "gunpowder or other explosives, excepting blasting powder and dynamite used for industrial purposes." Title III of the act of 1916 is entitled "Munition Manufacturer's Tax," and was intended to reach all the profits made by American munition makers during the war. This purpose is further disclosed by the exception just above quoted. On the other hand, it is clear that the statute does not include the ingredients or materials out of which military explosives might be made, not only because the language is not apt to express such a purpose, but also because an amendment was rejected

during the course of the bill through Congress which expressly included "any material entering into and used as a component part in the manufacture of" explosives or other munitions. The question is on which side of the line this product falls.

I do not think that it makes any difference in fact (as I shall try to show) whether or not wet picric acid be regarded as a finished product, but for the moment I shall assume that it does, and that unless the manufacture was completed no tax was legal. Even so, I regard this acid as completed. It is quite true that, before it can be used, it must be dried, and that that is a process, but it is only to remove the cushion or packing of water which is left to insure safety. No ordnance division wants wet picric acid, but they must accept it or it will not carry safely. It is apparently the notion of scientists that a film of water smears the surface of the crystals and acts inertly to prevent combustion. That seems to me to answer very nicely to the idea of a cushion interposed between the particles for the very purpose of keeping them from destruction in carriage.

The case is in this aspect very close to United States v. Ætna Explosives Co., 256 U. S. 402, 41 Sup. Ct. 513, 65 L. Ed. 1013. There the question was whether imported nitric acid was entitled to free entry. If it was nitric acid, it was; if a "mixture," it was not. In practice it was necessary, in order to avoid the corrosive action of nitric acid upon the steel tanks in which it was carried, to mix it with a percentage of sulphuric acid. The "mixture" had no commercial use, and was not intended to have. The sulphuric acid had to be separated from the nitric before use, and was added solely for safety of carriage. While, of course, the substance was literally a "mixture," and therefore within the language of the statute, the court looked at the purpose of the sulphuric acid added and decided that the importation was nitric acid alone. So in the case at bar, though water was allowed to remain in the picric acid, it was not wanted there; it was as much left there to insure safety as the sulphuric acid. Certainly the distinction cannot be whether water was added to the acid, or left in it in the process of manufacture.

But, if I am wrong in this, still I regard the decisions in Worth Bros. v. Lederer, 251 U. S. 507, 40 Sup. Ct. 282, 64 L. Ed. 377, and Forged Steel Wheel Co. v. Lewellyn, 251 U. S. 511, 40 Sup. Ct. 285, 64 L. Ed. 380, as controlling. Those cases involved steel shells under subdivision (1) (c) of section 301. The statute, under subdivision (1) (f), had, it is true, expressly covered "parts" of shells, and, if the cases had involved a completed part, I should agree that they were not here in point; but they did not. They did involve only a "part" of a shell, but the plaintiff in each case had not completed the part in question. On the contrary, out of a number of processes necessary to finish the part for incorportion into the shell, it performed only a few, bringing it nearer to completion, but never completing it. Assuming that I am wrong in regarding the plaintiff's manufacture in the case at bar as completed, and the percentage of water as left in the acid only for the purpose of a cushion or packing, nevertheless it appears to me that the relations of the plaintiffs in Worth Bros. v. Lederer, supra, and Forged Steel Wheel Co. v. Lewellyn, supra, to the

"part" of the shell was precisely similar to that of the plaintiff here toward the eventual explosive. The acid was manufactured to a point where nothing remained to be done but a finishing process. The cases cited expressly repudiate the requirement that the article shall be finished. Therefore, since an unfinished "part" of a shell is within the statute as a "part," I submit an unfinished "explosive" is similarly within the statute, though some "finishing" process yet remains to be done upon it. A precisely similar ruling regarding fuses is Dayton Brass Co. v. Gilligan, 277 Fed. 227 (C. C. A. 6).

I agree that Congress did not mean to tax "ingredients" of explosives, and that, as is so common when colloquial language is used, there is a chance for casuistry in deciding where the line should be drawn. In such cases it is best to judge by the rougher impression which the language creates. It seems to me a clear strain on the common sense of the section to call this substance only the "material" out of which an explosive can be made. I should have had more doubt, had the Supreme Court not so clearly indicated its understanding that the words were not to be read literally. Even without their ruling, that doubt would not have prevailed, I believe; but, after they have spoken, there seems to me no ground for hesitation. I cannot see that Munroe, etc., Co. v. Riordan, 280 Fed. 624 (C. C. A. 2) has any bearing on this case.

Verdict directed for the defendant.